UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UAP HOLDING CORP., et al.,

        Plaintiffs,

  v.

RON MAITOZA, et al.,

        Defendants.

CASE NO. C06-1332RAJ

ORDER

## I. INTRODUCTION

This matter comes before the court on Defendants' motion for summary judgment (Dkt. # 45) on Plaintiffs' breach of contract claims. Neither Plaintiffs nor Defendants have requested oral argument, and the court finds the motion suitable for disposition on the basis of the parties' briefing and supporting evidence. For the reasons stated below, the court DENIES Defendants' motion.

## II. BACKGROUND

In 2000, Defendant Ron Maitoza was hired by Plaintiff United Agri Products, Inc. ("UAP"), the largest independent distributor of non-crop fertilizer, seed, and pesticide products to markets – including golf courses, resorts, nurseries, greenhouses – in the United States and Canada. Parent company UAP Holding Corp. ("UAPHC") holds all the stock of UAP and UAP Distribution, Inc.[1]

---

[1] This order refers to Plaintiffs generally as "UAP" except where the context requires specificity.

ORDER - 1

1    Maitoza was a senior executive of UAP Distribution, the national vice president of
2 sales and operations for the non-crop division.  He participated in UAP's 2004 Deferred
3 Compensation plan, in which he waived a portion of his bonus in exchange for deferred
4 common stock units (a right to receive stock in the future) in UAPHC.  Maitoza Decl.
5 (Dkt. # 47) ¶ 15; McDaniel Decl. (Dkt. # 71) ¶ 5, Exs. A and B.  Maitoza would not have
6 access to these stock assets until the occurrence of certain qualifying events.  McDaniel
7 Decl., Exs. A and B.

8    In 2004, UAP made plans to take its stock public with an initial public offering
9 ("IPO").  Maitoza Decl., Ex. A; Suko Decl. (Dkt. # 72) ¶ 4.  UAP offered its senior
10 executives, including Maitoza, the opportunity to participate in the offering.  Maitoza
11 signed a Management Incentive Agreement ("the Agreement"), which allowed him to
12 realize his deferred stock and sell it in the IPO.  Maitoza Decl. ¶ 16, Ex. A (the
13 Agreement).  The Agreement also allowed Maitoza to sell stock in specified amounts
14 each quarter after December 2006.  Agreement § 1.2.

15    In addition to clauses addressing the IPO, the Agreement also contains a non-
16 competition section in Article III.  The scope of Article III is broader than other parts of
17 the Agreement, as the first section of Article III makes clear: "For purposes of this Article
18 III, the term 'Company' shall be deemed to include each of the subsidiaries of the
19 Company."  Agreement § 3.1.

20    In a subsequent section of Article III, entitled "Non-Solicitation, Non-Compete,"
21 Maitoza agreed that for one year after he left UAP Distribution's employ, he would not
22 "participate in . . . render services for, or in any manner engage in or represent any
23 business competing with the businesses or the products of the Company," nor would he
24 directly "or indirectly through another person":

25    (i)    induce or attempt to induce any employee of the Company to leave
           the employ of the Company or in any way interfere with the
26         [employment] relationship . . .
     (ii)   hire any person who was an employee of the Company until six (6)
27         months after such individual's employment relationship with the
           Company has been terminated or
28

ORDER - 2

(iii)     induce or attempt to induce any customer, supplier, licensee or other business relation of the Company to cease doing business with the Company, or in any way interfere with [that business relationship].

Agreement § 3.3. The Agreement is governed by Delaware law. Agreement § 13.3 Maitoza signed the Agreement in November 2004, and his employment was terminated in September 2005.

In late October 2005, Maitoza was hired by UAP rival ProSource One to head a new office in Sumner, Washington. Over the next year, six UAP employees who had worked with Maitoza left UAP to work for ProSource One. In August 2006, Plaintiffs brought suit against Defendants, alleging, *inter alia*, that Maitoza breached the non-solicitation/non-competition section of the Agreement. Maitoza has now moved for summary judgment on the contract claim.

## III.  DISCUSSION

**A.   Standard of Review on Summary Judgment.**

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden of demonstrating the absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met this initial burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine issue exists for trial. Fed. R. Civ. P. 56(e); *Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Where the evidence, viewed in the light most favorable to the non-moving party, presents a genuine issue of material fact, then summary judgment must be denied. *Fontana v. Haskin*, 262 F.3d 871, 876 (9th Cir. 2001).

**B.   Maitoza Has Not Shown That he is Entitled to Summary Judgment.**

Maitoza contends that Plaintiffs' contract claims should be dismissed for three reasons: 1) Maitoza could not breach the non-solitication/non-competition clause because the Agreement bars solicitation of UAPHC employees or customers, but UAPHC does

ORDER - 3

not have employees or customers; 2) the Agreement is unenforceable due to lack of consideration; and 3) even if the Agreement does apply to Maitoza and is enforceable, there is still no evidence Maitoza actually induced anyone to leave UAP.  As discussed below, the court rejects each of these contentions.

### 1. Article III of the Agreement Applies to Employees and Customers of UAPHC's Subsidiaries.

In the introductory section of the Agreement, "Company" is defined as UAPHC. Article III expressly modifies this definition, however: "For purposes of this Article III, the term 'Company' shall be deemed to include each of the subsidiaries of the Company, unless the context otherwise requires." Agreement § 3.1(b).

Defendants claim that the modification of the definition of "Company" is misleading because it is included at the end of the first section of Article III in a parenthetical.  Defendants also claim that the modification causes redundancies within Article III, which refers to both "the Company" and its "businesses."

The court finds nothing misleading about the placement of the modification.  Any redundancies caused by the modification are avoided by the text of the modification itself, which states that the modified definition applies "unless the context otherwise requires."  To the extent that Article III refers to both the Company and its businesses, even though "Company" includes its business for purposes of that section, the references are clear from the context.  Because Article III clearly applies to UAPHC and its subsidiaries, UAP Distribution employees and customers – the employees at issue in this case – are covered by the Agreement.

### 2. The Agreement is Supported by Consideration.

Any consideration will support a contract between competent parties.  *Glenn v. Tide Water Associated Oil Co.*, 101 A.2d 339, 344 (Del. Ch. 1953).  A new benefit to an employee may constitute sufficient consideration to support a restrictive covenant. *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 466-67 (Del. Ch. 1977).

ORDER - 4

Maitoza claims the Agreement lacks consideration because he did not receive anything in exchange for his promise not to solicit or compete. He contends that he had the right to a distribution of stock under the earlier Deferred Compensation plan, so the Agreement did not confer any new benefit to him.

Under the plain and unambiguous terms of the Agreement, UAP was required to, among other things, distribute shares of common stock from the Deferred Compensation Plan to Maitoza and allow him to sell them in the IPO, distribute additional shares to Maitoza in the future and permit him to sell those on specified dates, file securities registration statements, allow him participate in certain registration statements in the future, and indemnify him for certain losses if caused by errors in the IPO process. Agreement §§ 1.2, 7.1, 7.4, 7.7, 8.2; Suko Decl. ¶ 5. All of these employment-related benefits are consideration for Section 3.3 and Maitoza's other obligations under the Agreement.

Under the earlier Deferred Compensation plan, Maitoza was entitled to a distribution of certain shares in the event of an IPO, but no other rights to participation in the IPO were specified. UAP employees were required to sign the Agreement if they wanted to participate in the IPO. Suko Decl. ¶ 5. So while it is true that he had some stock rights before signing the Agreement, Maitoza obtained additional rights under the Agreement. Because the Agreement conferred new benefits on Maitoza, the Agreement is supported by consideration.

### 3. There are Genuine Issues of Material Fact as to Whether Maitoza Breached the Agreement by Inducing UAP Employees or Customers.

The Agreement bars Maitoza from competing with UAP, from inducing UAP employees or customers to leave UAP, from hiring former UAP employees within six months of their leaving UAP, and from interfering with UAP's employment and business relationships. *See* Agreement § 3.3(a).

Maitoza acknowledges that six former UAP employees were hired by ProSource One shortly after he was hired there, but claims that he did not induce those employees to

ORDER - 5

1 leave UAP.  He denies having any communication with three of those employees, and
2 claims that because the other three contacted him first, he did not induce them to leave
3 UAP.  He also claims that there is no evidence he induced any UAP customers.

4 　　　To contradict this claim, Plaintiffs have submitted evidence showing that Maitoza
5 played some role in recruiting some UAP sales personnel from the Auburn office to
6 ProSource One.  Plaintiffs have submitted documents written by Maitoza advising
7 ProSource One on how to best recuit UAP employees and directing other ProSource One
8 employees to offer jobs to UAP employees.  *See* Larson Decl. (Dkt. # 66), Exs. B-F, O.
9 Defendant Shane Riley also testified in a deposition that Maitoza asked him, while Riley
10 was still employed at UAP, to suggest names of other UAP employees who could be
11 interested in working for ProSource One.  *Id.*, Ex. O.

12 　　　The evidence before the court indicates a host of disputed facts and this court
13 cannot find as a matter of law that Maitoza's involvement in ProSource One's hiring of
14 former UAP employees does not violate of the terms of the Agreement.  The court must
15 deny Maitoza's summary judgment motion because the evidence viewed in the light most
16 favorable to Plaintiff presents genuine issues of material fact.  *See Fontana*, 262 F.3d at
17 876.

### IV.  CONCLUSION

19 　　For the reasons stated above, the court rejects each of Maitoza's arguments to
20 support dismissal of the contract claim.  IT IS HEREBY ORDERED that Defendants'
21 motion for summary judgment (Dkt. # 45) is DENIED.

　　　Dated this 22nd day of April, 2008.

_____
The Honorable Richard A. Jones
United States District Judge

ORDER - 6